Slip Op. 15-72

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE TIMKEN COMPANY,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES,<br><br>　　　　Defendant,<br><br>NSK LTD., NSK CORPORATION, NSK PRECISION AMERICA, INC., NTN BEARING CORP. OF AMERICA, NTN CORPORATION, NTN BOWER, INC., NTN DRIVESHAFT, INC., AMERICAN NTN BEARING MANUFACTURING CORP., JTEKT CORPORATION, JTEKT NORTH AMERICA, INC., NACHI-FUJIKOSHI CORPORATION, NACHI AMERICA, INC., NACHI TECHNOLOGY, INC.,<br><br>　　　　Defendant-Intervenors. | Before: Jane A. Restani, Judge<br><br>Consol. Court No. 14-00155 |

**OPINION**

[Plaintiff's motion for judgment on the agency record granted; Commerce's final results in antidumping duty administrative reviews remanded for Commerce to apply differential pricing analysis.]

Dated: July 8, 2015

　　Geert M. De Prest, Stewart and Stewart, of Washington, DC, argued for plaintiff. With him on the brief was Terence P. Stewart.

　　L. Misha Preheim, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were Benjamin C. Mizer, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director. Of counsel on the brief was Shana A. Hofstetter, Attorney,

Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

  Alexander H. Schaefer, Crowell & Moring, LLP, of Washington, DC, argued for defendant-intervenors. With him on the brief for NSK Ltd., NSK Corporation, and NSK Precision America, Inc. were Hea Jin Koh and Robert A. Lipstein.

  Kevin M. O'Brien, Diane A. MacDonald, Eunkyung Kim Shin, Baker & McKenzie, LLP, of Washington, DC, for defendant-intervenors NTN Bearing Corp. of America, NTN Corporation, NTN Bower, Inc., NTN Driveshaft, Inc., and American NTN Bearing Manufacturing Corp.

  Neil R. Ellis, Dave M. Wharwood, Rajib Pal, Sidley Austin, LLP, of Washington, DC, for defendant-intervenors JTEKT Corporation and JTEKT North America, Inc.

  Greyson L. Bryan, Jr., David J. Ribner, McAllister M. Jimbo, O'Melveny & Myers, LLP, of Washington, DC, for defendant-intervenors Nachi-Fujikoshi Corporation, Nachi America, Inc., and Nachi Technology, Inc.

**OVERVIEW**

  Restani, Judge: This matter is before the court on plaintiff The Timken Company's ("Timken") motion for judgment on the agency record pursuant to USCIT Rule 56.2. Timken contests the U.S. Department of Commerce's ("Commerce") final results in the 2009–2010 annual administrative reviews of the antidumping duty orders covering imports of ball bearings and parts thereof from Japan and the United Kingdom. Ball Bearings and Parts Thereof from Japan and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews and Rescission of Review in Part; 2009–2010, 79 Fed. Reg. 35,312 (Dep't Commerce June 20, 2014) ("Final Results"). Specifically, Timken challenges Commerce's failure to apply the differential pricing analysis to determine whether the examined foreign exporters engaged in targeted dumping. The court grants the motion and remands the Final Results to Commerce.

## BACKGROUND

This case concerns Commerce's decision not to apply the differential pricing analysis in the challenged administrative reviews to determine whether the examined foreign exporters engaged in a practice commonly referred to as "targeted dumping." To better understand the dispute, it is necessary to provide some background on the statutory and regulatory framework regarding targeted dumping before addressing Commerce's decision not to apply the differential pricing analysis in the administrative reviews at issue.

Prior to 2012, Commerce's default methodology for comparing home market and export prices in administrative reviews had been the average-to-transaction ("A-T") methodology. See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification, 77 Fed. Reg. 8101, 8101 (Dep't Commerce Feb. 14, 2012) ("Final Modification"). When applying the A-T methodology, Commerce did not allow transactions with export prices above the home market price to offset transactions with export prices below the home market price, a controversial practice commonly referred to as "zeroing."[1] Id.

Commerce's default comparison methodology in investigations in 2012, however, was (and continues to be) the average-to-average ("A-A") methodology, without zeroing. See 19 U.S.C. § 1677f-1(d)(1)(A) (2012); see also Beijing Tianhai Indus. Co. v. United States, 7 F. Supp. 3d 1318, 1325 (CIT 2014). Commerce is permitted to use the A-T methodology in an investigation if it finds "a pattern of export prices (or constructed export prices) for comparable

---

[1] For a detailed explanation of the zeroing practice and its history, see Union Steel v. United States, 823 F. Supp. 2d 1346 (CIT 2012), aff'd, 713 F.3d 1101 (Fed. Cir. 2013).

merchandise that differ significantly among purchasers, regions, or period of time." 19 U.S.C. § 1677f-1(d)(1)(B)(i). This pattern is commonly referred to as "targeted dumping." Additionally, Commerce must explain why the default A-A methodology cannot take account of the pattern before the A-T methodology can be employed. Id. § 1677f-1(d)(1)(B)(ii).[2]

Starting in 2008, Commerce began using the "Nails test"[3] in investigations to determine whether there was targeted dumping.[4] See Mid Continent Nail Corp. v. United States, 712 F. Supp. 2d 1370, 1372–73 (CIT 2010). Under the Nails test, Commerce required domestic petitioners to make allegations of targeted dumping before Commerce would determine whether targeted dumping was occurring. Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Light-Walled Rectangular Pipe and Tube from Mexico; 2011–2012 at 3–4, A-201-836, (Jan. 22, 2014), available at http://enforcement.trade.gov/frn/summary/mexico/2014-02068-1.pdf (last visited June 29, 2015)

---

[2] The transaction-to-transaction methodology also is listed as a preferred methodology, but Commerce, for practical reasons, rarely employs this methodology. See 19 C.F.R. § 351.414(c)(2) (2014) ("The Secretary will use the transaction-to-transaction method only in unusual situations, such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made.")

[3] The Nails test gets its name from the proceedings in which the test was first used. See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008); Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less than Fair Value, 73 Fed. Reg. 33,985 (Dep't Commerce June 16, 2008).

[4] The actual details of the Nails test are not in question, nor are they relevant to resolution of the issue at hand. For a detailed discussion of the Nails test, see Timken Co. v. United States, 968 F. Supp. 2d 1279 (CIT 2014), aff'd without opinion, 589 F. App'x 995 (Fed. Cir. 2015). Similarly, the actual mechanics of the differential pricing analysis are not relevant to resolution of this case. For a detailed discussion of the differential pricing methodology, see Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. 26,720 (Dep't Commerce May 9, 2014).

Consol. Court No. 14-00155                                                                                      Page 5

("Mexican Pipe and Tube"). For several years, the Nails test was applicable only to investigations because, as explained, the A-T comparison methodology was used in administrative reviews by default.

On February 14, 2012, Commerce announced that the A-A methodology (without zeroing) would be the new default comparison methodology for administrative reviews. Final Modification, 77 Fed. Reg. at 8101–02. Commerce, however, did not rule out the use of the A-T methodology with zeroing in all circumstances. See id. at 8102. Rather, Commerce explained that its practice in reviews would parallel its practice in investigations, under which Commerce used the A-T methodology with zeroing where it found targeted dumping and explained why the A-A methodology could not take account of the pattern of differing prices. See id. At the time of the Final Modification, Commerce's practice was to use the Nails test in order to determine whether there was targeted dumping in deciding if the alternative A-T methodology should apply. Accordingly, no mention was made of a differential pricing analysis. Commerce explained that the Final Modification would govern (1) administrative reviews with preliminary results issued after April 16, 2012, and (2) administrative reviews discontinued as of February 14, 2012, and resumed after April 16, 2012. Id. at 8113.

On March 4, 2013, Commerce first used the differential pricing analysis instead of the Nails test in a targeted dumping analysis in the investigation of xanthan gum from the People's Republic of China. See Xanthan Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 78 Fed. Reg. 33,351, 33,351–52 (Dep't Commerce June 4, 2013). Since that date, Commerce generally has applied the differential pricing analysis in all

Consol. Court No. 14-00155                                                                                         Page 6

investigations and reviews when the preliminary results have issued after March 4, 2013.[5]  See Issues and Decisions Memorandum for the Antidumping Duty Administrative Review on Certain Frozen Warmwater Shrimp from Thailand at 22, A-549-822, (July 10, 2013), available at http://enforcement.trade.gov/frn/summary/thailand/2013-17042-1.pdf (last visited June 29, 2015) ("Thai Frozen Warmwater Shrimp").  Importantly, Commerce performs the differential pricing analysis sua sponte, using sales data submitted by the parties, in order to determine whether there is targeted dumping; no allegation of targeted dumping is needed.  Mexican Pipe and Tube at 4–5.  As explained above, Commerce previously had required petitioners to file allegations of targeted dumping before Commerce would employ the Nails test.

   Turning to the facts of this case, Commerce issued the preliminary results for these administrative reviews on April 21, 2011.  Issues and Decision Memorandum for the Antidumping Duty Administrative Reviews of Ball Bearings and Parts Thereof from Japan and the United Kingdom; 2009–2010 at 1, A-588-804, A-421-801, (June 13, 2014), available at http://enforcement.trade.gov/frn/summary/multiple/2014-14493-1.pdf  (last visited June 29, 2015) ("I&D Memo").  At that time, the default comparison methodology in reviews remained the A-T methodology with zeroing, so no allegations regarding targeted dumping would have been relevant.  On July 15, 2011, Commerce discontinued the reviews because of related litigation in the U.S. Court of International Trade and the Court of Appeals for the Federal

---

[5] Commerce explained in its request for comment on the differential pricing analysis that it was switching from the Nails test to this analysis "based on the Department's further research, analysis and consideration of the numerous comments and suggestions on what guidelines, thresholds, and tests should be used in determining whether to apply an alternative comparison method based on the average-to-transaction method."  Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. at 26,722.

Circuit.  See id.  Then, over two years later, Commerce resumed the instant reviews, effective November 29, 2013.  Ball Bearings and Parts Thereof From Japan and the United Kingdom: Notice of Reinstatement of Antidumping Duty Orders, Resumption of Administrative Reviews, and Advance Notification of Sunset Reviews, 78 Fed. Reg. 76,104 (Dep't Commerce, Dec. 16, 2013).  Because the reviews were discontinued as of February 14, 2012, and resumed after April 16, 2012, all parties agree that the instant reviews became subject to the Final Modification, that is, the A-A methodology would be the default comparison methodology.  77 Fed. Reg. at 8113; Pl.'s Reply Br. in Supp. of Its Mot. for J. on the Agency R. 2–3, ECF No. 66 ("Timken Reply Br."); Def.'s Resp. to Pl.'s Rule 56.2 Mot. 8, ECF No. 64 ("Gov. Br."); Def.-Intvnrs' Resp. in Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R. 9, ECF No. 65 ("Def.-Intvnrs' Br.").

Commerce issued "post-preliminary"[6] results on March 25, 2014.  Post-Preliminary Analysis Memorandum and Intent to Rescind a Review in Part, bar code 3190716-01 (Mar. 25, 2014).  Commerce did not make any changes from the preliminary results except to apply the change in default methodology announced in the Final Modification.  See id. at 5–6.  Even though these "post-preliminary" results were issued over a year after the differential pricing analysis was first applied in Xanthan Gum, Commerce applied the A-A methodology here without performing any targeted dumping analysis.  See Gov. Br. at 8.

Timken subsequently met with Commerce officials and submitted comments questioning Commerce's failure to use the differential pricing analysis to determine whether there was targeted dumping.  Pl.'s Mem. of P. & A. in Supp. of Its Mot. for J. on the Agency R. 15, ECF No. 55 ("Timken Br.").  On June 13, 2014, Commerce issued the Final Results, and, again, did

---

[6] This is a term not found in the statute or regulations.

not apply the differential pricing analysis. See I&D Memo at 6–7. Addressing Timken's comments in the I&D Memo, Commerce explained that it had "expressly limited the application of our [differential pricing] analysis to those reviews for which preliminary results were signed and issued after March 4, 2013." Id. at 7. For this proposition, Commerce cited the issues and decision memorandum accompanying an unrelated administrative proceeding. See id. at 7 & n.14. Commerce also asserted that the statute's use of the word "may" gives Commerce discretion in determining whether or not to use the A-T comparison methodology, and that "[g]iven the timing of the Preliminary Results in this review, we exercised our discretion and determined not to consider using the A-T method in these reviews." Id. The margins for each of the foreign respondents using the A-A comparison methodology without zeroing was calculated at zero. Final Results, 79 Fed. Reg. at 35,313–14.[7]

Timken now challenges Commerce's failure to employ the differential pricing analysis.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). "This standard requires that Commerce . . . 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Tianjin Magnesium Int'l Co. v. United States, 722 F. Supp. 2d 1322, 1328 (CIT 2010)

---

[7] According to Timken, had Commerce employed the differential pricing analysis, the resulting weighted-average dumping margins for the individually examined respondents would have been more than de minimis. Pl.'s Mem. of P. & A. in Supp. of Its Mot. for J. on the Agency R. 16–17 & n.43, ECF No. 54 (confidential version).

(quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

## DISCUSSION

Timken argues that Commerce failed to adequately explain its departure from what Timken alleges is a consistent practice of applying the differential pricing analysis in proceedings after March 4, 2013. Timken Br. at 18–29. Timken also argues that it would be an abuse of discretion for Commerce to completely close off a targeted dumping inquiry in this case without any explanation besides the statute's directive that Commerce "may" employ the alternative A-T methodology. Timken Br. at 30–36.

Defendant the United States ("the government") argues that Commerce's determination was consistent with its stated policies, in that the reviews were subject to the Final Modification, but the differential pricing analysis applies only to cases in which the original preliminary results issued after March 4, 2013. Gov. Br. at 10–12. According to the government, because the differential pricing analysis was inapplicable, Timken was required to rely on the Nails test to show that targeted dumping had occurred. Id. at 12–14. Because Timken never submitted the necessary targeted dumping allegations in order to perform the Nails test, Commerce appropriately employed the default A-A comparison methodology. Id. Defendant-intervenors similarly contend that Timken should have submitted Nails test allegations and Timken's failure to do so is fatal to its case. See Def.-Intvnrs' Br. at 10–16. The government additionally contends that Commerce's use of the A-A methodology in this case was a reasonable exercise of its discretion. Gov. Br. at 14–17.

In rebuttal to the various arguments raised by the government and defendant-intervenors, Timken argues that there is no established practice of limiting the application of the differential pricing analysis solely to cases wherein the preliminary results issued before March 4, 2013. Timken Reply Br. at 6–11.  Timken notes that the cases cited for this proposition declined to apply the differential pricing analysis for practical and policy reasons that were independent of the date of the preliminary results.  Id.  According to Timken, the reasons given in those cases for declining to apply the differential pricing analysis support applying it in this case.  Id. at 12–13.  Timken also notes that Commerce never relied on the absence of Nails test allegations in explaining its decision to apply the A-A comparison.  Id. at 5; Timken Br. at 5, 27.[8]

The court will first address the government's and defendant-intervenors' justifications based on the date of the preliminary results.  The court then will address the arguments based on the statute's use of the word "may."  Based on the facts of this case, the court determines that Commerce's failure to employ the differential pricing analysis was unreasonable and an abuse of its discretion.

**I.      The Date of the Preliminary Results Is Not a Sufficient Justification in this Case**

Commerce explained in the I&D Memo that it had "expressly limited the application of [the differential pricing] analysis to those reviews for which preliminary results were signed and issued after March 4, 2013."  I&D Memo at 7.  The government and defendant-intervenors

---

[8] Counsel for Timken at oral argument asserted for the first time before the court that Timken did in fact submit the necessary allegations for Commerce to perform the Nails test.  Were it relevant, the most appropriate time to raise this contention would have been in Timken's reply brief (accompanied by the relevant portions of the administrative record), when Timken was responding to the arguments made the by the government and defendant-intervenors in their respective briefs.


reiterate this point. They further assert that the Nails test was the appropriate test and that the A-A methodology was applied because Timken never made the proper Nails test allegations. The court rejects these arguments based on the facts of record.

As Timken points out, Commerce never justified the use of the A-A comparison methodology based on the lack of Nails test allegations. As a general matter, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." State Farm, 463 U.S. at 50. Read literally, the I&D Memo suggests that because of the date of the preliminary results and when the reviews were resumed, the reviews are subject to the Final Modification's change of the default methodology to the A-A comparison methodology, but not to Commerce's exception in the Final Modification that allows application of the A-T methodology. See I&D Memo at 7; 77 Fed. Reg. at 8102. It also singles out these reviews for disparate treatment without any explanation other than the dates of the preliminary results and the reinstatement order. An agency is free to change or deviate from its settled practice, but it must provide a reasoned explanation for doing so. See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973); Save Domestic Oil, Inc. v. United States, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004). Even assuming that Commerce implicitly determined that, in this case, any targeted dumping inquiry would be governed by the Nails test instead of the differential pricing analysis, see State Farm, 463 U.S. at 43 (agency determinations may be upheld if agency's path is reasonably discernable), its determination does not withstand scrutiny.

Commerce stated that it had "expressly limited" application of the differential pricing analysis to reviews in which preliminary results were issued after March 4, 2013. I&D Memo at 7. For this proposition, Commerce cited Certain Frozen Warmwater Shrimp From Thailand:

Final Results of Antidumping Duty Administrative Review, Partial Recision of Review, and Revocation of Order (in Part); 2011–2012, 78 Fed. Reg. 42,497 (Dep't Commerce July 16, 2013). I&D Memo at 7 & n.14. In the issues and decision memorandum in that case, Commerce noted: "The Department has recently implemented its differential pricing analysis on a case-by-case basis such that it has been applied in investigation preliminary determinations and review preliminary results signed and issued after March 4, 2013." Thai Frozen Warmwater Shrimp at 22. Commerce further explained that "[w]hile we have switched to a differential pricing analysis for administrative reviews with preliminary results following the Xanthan Gum Investigation post-preliminary analysis, the Nails test is still a statutorily-consistent and valid method for determining whether to apply an A-to-T comparison method as an alternative to an A-to-A comparison method." Id. at 23. Commerce then explained that it was declining to depart from the Nails test, which it had used in the preliminary results. Id.

   Defendant-intervenors cite several other cases supposedly supporting this proposition, but in only one of these cases did Commerce discuss whether the Nails test or the differential pricing analysis should apply. In Fresh Garlic from China, Commerce stated: "The Department has implemented its differential pricing analysis on a case-by-case basis such that it has been applied in review and investigation preliminary results issued after March 4, 2013." Issues and Decision Memorandum for the Final Results and Rescission, in Part, of the Antidumping Duty Administrative Review of Fresh Garlic from the People's Republic of China 10, A-570-831, (June 10, 2013), available at http://enforcement.trade.gov/frn/summary/prc/2013-14329-1.pdf (last visited June 29, 2015) ("Fresh Garlic from China"). Commerce added: "We also note that while we have switched to a differential pricing analysis for preliminary results issued after

March 4, the Nails test is still a statutorily-consistent and valid method for determining whether to apply an average to transaction comparison . . . ." Id. Commerce noted that the Nails test applied at the time the preliminary results were issued in December 2012 and that "[i]n order to apply differential pricing in this proceeding, the Department would have had to issue amended calculations (applying the differential pricing methodology) and allowed parties to submit comments on these results." Id. at 9–10. Commerce determined that it did not have enough time within the statutory deadlines for completion of the review to do so. Id. at 10.

The reviews cited are clearly distinguishable from the administrative reviews currently before the court and do not provide a reasonable basis for Commerce's failure to apply the differential pricing analysis in this case. In the cases discussed above and cited by defendant-intervenors, the Nails test clearly governed the preliminary results, and the parties to those proceedings presumably were aware of that fact. Petitioners in those cases thus had either submitted Nails test allegations and Commerce had performed a targeted dumping inquiry, or petitioners failed to submit the allegations, but were on clear notice that they should have done so. Changing the targeted dumping methodology late in the proceedings would have created administrative problems such as those identified in Fresh Garlic from China. In those cases, maintaining consistency in the applicable targeted dumping analysis between the preliminary and final results was fair to the parties and avoided administrative difficulties.

Here, however, the original preliminary results issued before the Final Modification. During that time, no targeted dumping analysis applied, because the default comparison methodology in reviews was the A-T methodology. For purposes of applying the A-A methodology as the default or conducting any targeted dumping analysis, only after resumption

of the reviews was any targeted dumping methodology pertinent.  As explained above, the reviews were resumed nine months after Commerce had introduced the differential pricing analysis as the new targeted dumping methodology, and the "post-preliminary" results issued a full year after Commerce had transitioned to the new test.  There were no equitable or administrative reliance interests in employing the Nails test based on the original preliminary results, because there was no prior practice of relying on the Nails test applicable to this case.  The government at oral argument specifically conceded that applying the differential pricing analysis would not have created any administrative burden.  In this regard, the "post-preliminary" results issued following the resumption of the reviews were the functional equivalent of the preliminary results in the cases cited by Commerce and the defendant-intervenors, as this was the first opportunity for Commerce to apply a targeted dumping analysis.

Commerce presumably believes that the differential pricing analysis is preferable to the Nails test in conducting the targeted dumping inquiry, otherwise Commerce would not have abandoned the Nails test in its favor.  See Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. 26,720, 26,722 (Dep't Commerce May 9, 2014) ("Given the Department's experience over the last several years, and based on the Department's further research, analysis and consideration of the numerous comments and suggestions on what guidelines, thresholds, and tests should be used in determining whether to apply an alternative comparison method based on the average-to-transaction method, the Department is developing a new approach for determining whether application of such a comparison method is appropriate in a particular segment of a proceeding pursuant to 19 CFR 351.414(c)(1) and consistent with section 777A(d)(1)(B) of the Act.  The new approach is referred to as the 'differential pricing' analysis,

as a more precise characterization of the purpose and application of section 777A(d)(1)(B) of the Act."). At the time the relevant reviews were reinstated, the differential pricing test already had been broadly adopted. Commerce provided no reason for its refusal to apply its current methodology and its supposed reversion back to the test it had abandoned nine months before these reviews were reinstated other than the arbitrary cut-off date discussed in the cases cited above. But the cut-off date made some sense in those cases. The practical difficulties of switching from the Nails test to the differential pricing test late in the administrative proceedings weighed against employing the new test. In this case, Commerce was not sticking with the test that it had already applied or could have applied—the "post-preliminary" results were the first opportunity for a targeted dumping analysis of any type to be applied. As explained above, there was no raising of administrative burden or equitable interest in applying the Nails test, and Commerce's arbitrary cut-off date makes no sense in this case. Commerce has not provided a reasonable justification for refusing to apply its most current methodology to these reviews, and the court holds that the failure to apply the differential pricing analysis was an abuse of discretion.

The arbitrariness of Commerce's determination is evidenced further by the lack of notice given to Timken that the Nails test, which places the burden on petitioners to initiate the targeted dumping inquiry, would be applied instead of the differential pricing analysis that Commerce was applying in the other administrative proceedings at the time. Commerce ultimately seeks to use the default comparison methodology applicable on November 29, 2013 (the date the reviews were reinstated), but for determining whether any exception to that default methodology should apply, Commerce seeks to use the test that was applicable on April 21, 2011 (the date the

preliminary results were issued).  The cases cited by the government and defendant-intervenors failed to provide adequate notice that Commerce might take such a strange position.

Commerce never clearly stated that the differential pricing analysis would apply only in reviews with preliminary results following March 4, 2013.  The statements quoted and discussed above reasonably could be read as providing context for the parties' arguments in those cases (i.e., to establish that Commerce had put forward a new methodology while the proceedings were ongoing) and/or to describe Commerce's practice until that point.  Notably, Commerce did not reject application of the differential pricing analysis in those cases simply because of the date of the preliminary results.  In Thai Frozen Warmwater Shrimp, Commerce already had applied the Nails test in the preliminary results, and the respondent seeking the differential pricing analysis would not have received any benefit from the change in methodology because it had received a de minimis margin even though the Nails test was used.  Thai Frozen Warmwater Shrimp at 23.  The date of the preliminary results, by itself, was not a key factor in the analysis.  Similarly, in Fresh Garlic from China, Commerce explained that it was too late in the proceedings to switch from one targeted dumping methodology to another and complete the review within the statutory deadline.  Fresh Garlic from China at 10.  Again, the date of the preliminary results, by itself, was not the dispositive factor.

The language Commerce used in the cited cases was equivocal, Commerce did not base its decisions solely on the date of the preliminary results, and the reasons given for not applying the differential pricing analysis in those cases do not apply in this case.  The passages supposedly giving "notice" from these other administrative cases stand in stark contrast to the straightforward and unequivocal statement in the Final Modification that clearly explained which

proceedings were subject to the change in the default comparison methodology. See 77 Fed. Reg. at 8113. One might further argue that parties do not receive notice from statements buried in issues and decision memoranda in other cases, even when clearer than the ones at issue here. Issues and decision memoranda are not published in the Federal Register. Rather, they must be accessed through Commerce's website or legal research databases such as Lexis or Westlaw. One could also assume that had Commerce chosen a more public form of notice to announce its asserted policy, it might have used clearer language, as it did in the Final Modification.

　　　Under the facts of this case, Timken was entitled to assume that Commerce would apply the same analysis it was applying in other proceedings at the time (i.e., differential pricing), and Commerce's failure to do so was unreasonable.[9] Again, it was only at this time that the new default A-A methodology was applied to these reviews, and thus it was the first time that any targeted dumping analysis became relevant. Timken did not have sufficient reason to know that Commerce, despite applying the differential pricing analysis in investigations and reviews for a year before the "post-preliminary" results, would revert back to a test that it had abandoned a year prior and had never applied in any segment of these reviews.[10] This failure to give Timken

---

[9] An opinion of this Court recently held that a party in that case could "not rely on the Xanthan Gum [post-preliminary analysis] memorandum for its claim that the memorandum established a change in the controlling law obligating Commerce to take action" regarding the differential pricing analysis. See Husteel Co. v. United States, Slip Op. 15-66, 2015 WL 3853709, at *14 (CIT June 23, 2015). In that case, at the time the party submitted its arguments regarding the differential pricing analysis to Commerce, Commerce had yet to apply the analysis in a final determination. See id. at *13–14. Thus, the party could not show that there had been an actual change in law or policy. This is clearly distinguishable from the case here, where the differential pricing analysis had been applied in numerous cases before the reviews at issue were resumed and targeted dumping became relevant.

[10] The court emphasizes that Commerce did not simply change the statistical standards by which it would determine whether there was targeted dumping, but rather Commerce changed its

sufficient notice as to the applicable inquiry bolsters the court's conclusion that Commerce abused its discretion. See Borden, Inc. v. United States, 22 CIT 233, 240–42, 4 F. Supp. 2d 1221, 1228–30 (1998) (remanding for Commerce to articulate standards by which it would evaluate targeted dumping allegations after Commerce repeatedly rejected allegations without explaining what was required to initiated targeted dumping inquiry), overruled in part on other grounds by Micron Tech., Inc. v. United States, 243 F.3d 1301, 1316 (Fed. Cir. 2001).

## II.     Commerce Abused the Discretion Given to It by the Statute

Commerce additionally relied on the language in 19 U.S.C. § 1677f-1(d) that provides that Commerce "may" use the A-T comparison methodology if the statutory criteria are met. The court has recognized that the statute gives Commerce discretion in determining, based on standards it chooses, to apply the A-T comparison methodology or not, even in the face of some evidence of targeted dumping. See Timken Co. v. United States, 968 F. Supp. 2d 1279, 1289–91 (CIT 2014), aff'd without opinion, 589 F. App'x 995 (Fed. Cir. 2015). The use of the word "may," however, does not give Commerce the freedom to act arbitrarily.

Even when operating under a statute that explicitly gives Commerce discretion, "if Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." Save Domestic Oil, 357 F.3d at 1283–84. As explained above, Commerce appears to have singled out these reviews by applying the new default A-A comparison methodology without even considering whether the

---

practice as to who must initiate a targeted dumping inquiry in the first place. Assuming that Commerce's assertion that Timken's failure to submit Nails test allegations formed part of its reasoning and was supported by the record, Timken was not simply faced with a new methodology on which to comment, but rather was given the burden of making allegations Timken had no clear understanding that it had to make.

alternative A-T methodology might be appropriate. Commerce has failed to explain this departure. Even assuming that Commerce's implicit reasoning was that any targeted dumping analysis was subject to procedures surrounding the Nails test, and thus these reviews were treated similarly to other reviews subject to the Nails test, the court holds that this would be an abuse of discretion under the facts of this case. As indicated above, at the time the reviews were reinstated and the "post-preliminary results" were issued, the differential pricing test had long been in place, and Timken lacked sufficient notice that it would be required to make allegations relevant to a test that Commerce had abandoned many months prior. Although the statute gives Commerce discretion in determining whether to apply the A-T methodology, parties generally are entitled to notice as to how Commerce plans to conduct its targeted dumping inquiry. See Borden, 22 CIT at 240–42, 4 F. Supp. 2d at 1228–30. Timken lacked that notice, and the statute's use of the word "may" does not deprive them of that right.

## CONCLUSION

For the reasons stated above, Commerce's refusal to perform the differential pricing analysis was unreasonable and an abuse of discretion. The case therefore is remanded to Commerce for it to apply the differential pricing analysis. The court notes that Commerce declined to address certain issues in the I&D Memo on the grounds that the use of the A-A comparison methodology without a targeted dumping inquiry mooted those issues. The court also recognizes that the respondents' had no need to challenge in court any determinations made by Commerce in the Final Results because they received zero margins; respondents, however, may wish to raise these issues either before the agency or before the court if application of the differential pricing analysis results in non-de minimis margins. To facilitate the efficient

Consol. Court No. 14-00155                                                                                      Page 20

resolution of this case, Commerce shall identify as early as possible the issues that it will consider on remand and those issues for which it will adopt the analysis contained in the <u>I&D Memo</u>.  Commerce shall make clear in the remand results which issues were considered anew and which issues are governed by the analysis in the <u>I&D Memo</u>.

     Remand results shall be filed by September 10, 2015.  Because the court cannot anticipate the scope of the arguments following remand, which may include issues that are not presently before the court, the parties shall confer and file a joint status report or proposed briefing schedule within fourteen days of the filing of the remand results.

                                                                            /s/ Jane A. Restani
                                                                               Jane A. Restani
                                                                                      Judge

Dated: July 8, 2015
       New York, New York